UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRINCETON INVESTMENT PARTNERS, LTD., <br><br> Plaintiff, <br><br> v. <br><br> RLI INSURANCE COMPANY, and JOHN AND JANE DOES 1-5 and ABC COMPANY 1-5, said Names being Fictitious, <br><br> Defendants. | Civ. No. 17-1120 (KM) (MAH) <br><br> OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Princeton Investment Partners, Ltd. ("Princeton") was sued in state court by USI Insurance Services ("USI"), a life insurance provider, and Robert Cope ("Cope"), an insurance broker. The suit between Princeton and USI/Cope settled with no payment of damages by Princeton. Now, Princeton sues its professional liability insurer, defendant RLI Insurance Company ("RLI"), for the costs of defense of the state action. RLI has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), while Princeton has made a cross-motion for summary judgment under Fed. R. Civ. P. 56. Because an exclusion in the RLI policy applies to the suit brought by USI and Cope, I will deny Princeton's motion for summary judgment and grant RLI's motion for judgment on the pleadings. RLI is not liable for Princeton's defense costs.

## I. Summary[1]

To understand this case, it is necessary to review the controversy behind the controversy.

Old Nassau Imports, LLC ("Old Nassau") was a client of Princeton, which provided managerial services under a contract. This case stems from the

---

[1] There are three complaints at issue in this case. First (and what is at the center of this case) is the complaint by Old Nassau against USI and Cope over the lapse, which, for ease of reference, brevity, and consistency, I will label as the "Initial Complaint." (ECF no. 1, ex. C.) Second is the complaint by USI and Cope alleging that Princeton is the negligent party and thus at fault, a case which has since settled, which I will label as the "Underlying 3P Complaint." (ECF no. 1, ex. A.) Third is the Notice of Removal of the Declaratory Action by Princeton against RLI seeking coverage. (ECF no. 1.)

Record items cited repeatedly will be abbreviated as follows:

| | |
|---|---|
| IC = | Second Amended Complaint and Jury Demand ("Initial Complaint") [ECF no. 1, ex. C.] |
| UC = | USI Insurance Services, LLC's and Robert Cope's Third-Party Complaint Against Princeton Investment Partners and Jury Demand ("Underlying Complaint") [ECF no. 1, ex. A.] |
| Def. Br. = | Memorandum of Law in Support of RLI's Motion for Judgment on the Pleadings [ECF no. 18] |
| Pl. Opp./Br. = | Memorandum of Law in Support of Princeton's Cross-Motion for Summary Judgment and in Opposition to RLI's Motion for Judgment on the Pleadings [ECF no. 24] |
| Pl. St. = | Princeton's Statement of Material Facts Not in Dispute [ECF no. 25] |
| Def. Reply/Opp. = | RLI's Reply Memorandum of Law in Further Support of its Motion for Judgment on the Pleadings and in Opposition to Princeton's Cross-Motion for Summary Judgment [ECF no. 34] |
| Def. Resp. = | RLI's Response to Princeton's Statement of Material Facts Not in Dispute [ECF no. 34] |
| Def. Ctrstmt. = | RLI's Counter-Statement of Material Facts Not in Dispute [ECF no. 34] |
| Pl. Reply = | Reply Memorandum of Law in Further Support of Princeton's Cross-Motion for Summary Judgment and in Opposition to RLI's Motion for Judgment on the Pleadings [ECF no. 42] |
| Pl. Resp. = | Princeton's Response to RLI's Statement of Material Facts Not in Dispute [ECF no. 42] |

2

lapsing of $15 million worth of "key person"[2] life insurance policies covering Old Nassau's previous Chief Executive Officer, Malcolm Lloyd. (Pl. St. ¶ 14; Def. Resp. ¶ 14.) Upon Mr. Lloyd's passing, learning that its claim under the key person policies would not be paid, Old Nassau instituted an action in New Jersey state court against USI, one of the insurers, and Cope, the insurance broker. (Def. Ctrstmt. ¶ 6; Pl. Resp. ¶ 6.) This complaint (which I will call the "Initial Complaint" in the "Initial Action") alleged that USI and Cope were negligent in not informing Old Nassau that its policy payments were not being received and in failing to investigate the cause of Old Nassau's failure to make payment (among other things, there seems to have been an address mix-up). (IC ¶¶ 72, 90.)

In August 2016, in the Initial Action, USI and Cope filed a third-party complaint seeking to shift liability to Princeton. (I will call this the "Underlying 3P Complaint" in the "Underlying 3P Action".) Their Underlying 3P Complaint alleged that Princeton was negligent in its role of "ensur[ing] that Old Nassau timely paid its life insurance policy premiums" and ought to be held liable for the lapse in coverage. (Pl. St. ¶ 9; Def. Resp. ¶ 9; UC ¶¶ 21–24.) After several months of negotiations, Princeton settled with USI and Cope. The settlement required no payment by Princeton. (Pl. Reply 1; Letters (ECF nos. 35–36, 40–41).)

That brings us to this lawsuit, which had its origin as a fourth-party complaint in the Initial Action, but was severed and removed to this Court. Princeton had a professional services liability insurance policy with RLI for the September 2015 to September 2016 term. (Pl. St. ¶ 2; Def. Resp. ¶ 2.) In this action, Princeton seeks reimbursement under the RLI Policy for the costs of defending against the third-party claims of USI and Cope.

The basic coverage language of the RLI policy is as follows:

> [RLI] will pay on behalf of the **Insured, Damages** in excess of the Deductible and not exceeding the Limits of Liability shown on the Policy

---

[2] The parties employ the traditional terminology, "key man." I have substituted the generic designation "key person." There is no change in substance.

3

Declarations that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** and first reported to the Insurer during the **Policy Period**, the Automatic Extended Reporting Period, or if applicable, during the Extended Reporting Period, for **Wrongful Acts** to which this insurance applies. (Pl. St. ¶ 4; Def. Resp. ¶ 4; Target Professionals Personal Services Liability Policy Declarations § 1.a ("Insuring Agreements").)

The RLI policy also covers costs of defense:

[RLI] has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent. [RLI] will pay **Claim Expenses** pursuant to its duty to defend **Claims** to which the insurance applies. . . . (Pl. St. ¶ 5; Def. Resp. ¶ 5; Target Professionals Personal Services Liability Policy Declarations § 4 ("Defense and Settlement).)

The RLI Policy separately defines the terms "Wrongful Act," "Professional Services," and "Management Consulting Services":

**"Wrongful Act"** means any actual or alleged error, omission or negligent act, committed solely in the rendering of or failure to render **Professional Services** by an **Insured** or any person or entity for which the **Insured** is legally liable. **Wrongful Act** also means any actual or alleged error, omission or negligent act committed solely in the rendering of or failure to render **Professional Services** by an **Insured** or any person or entity for which the **Insured** is legally liable and that results in **Personal Injury**. . . .

**"Professional Services"** means services rendered to others for a fee solely in the conduct of the **Insured's** profession as stated in Item 7 of the Policy Declarations, including such services provided electronically utilizing the Internet or a network of two or more computers. . . .

**"Management Consulting Services"** means: (i) analysis of management and operational issues and development of improvement plans; or (ii) advice and guidance on development and implementation of strategic goals, and objectives; or (iii) advice and guidance on improving the efficiency of functional or operational areas through technology and human resource solutions; or (iv) development and implementation of coaching skills for management and key personnel. (Pl. St. ¶¶ 5, 7; Def. Resp. ¶¶ 5–7; Target Professionals Personal Services Liability Policy Declarations § 5.m, q ("Definitions"), § 1 ("Management Consulting Services Endorsement").)

4

The RLI Policy also contains exclusions from coverage, two of which are potentially pertinent. The policy states that RLI "shall not be liable for **Damages** or **Claim Expenses** in connection with any **Claim** arising out of, directly or indirectly resulting from or in consequence of or in any way involving: . . .

> f. the performance of or failure to perform **Professional Services** for: (i) any **Insured**; or (ii) any entity owned or controlled by any person or entity included within the definition of **Insured**; or (iii) any person or entity which owns or controls any entity included within the definition of **Insured**; or (iv) any entity which is under common ownership or control with any entity included within the definition of **Insured**; or (v) any entity of which any person within the definition of **Insured** is a director, officer, partner, member or more than a three percent (3%) shareholder; or . . .
>
> h. any actual or alleged failure to effect or maintain any insurance or bond; or . . .
>
> p. any actual or alleged rendering or failure to render investment or insurance counseling or advice; the purchase or selling of, or failure to purchase or sell an investment or insurance of any kind; or any **Insured's** advice, promise(s) or guarantee(s) regarding the future value of any investments or interest rate or rate of return; or any **Insured's** advice, promise(s) or guarantee(s) regarding the coverage provided or not provided by insurance of any kind.

(Def. Ctrstmt. ¶¶ 22–24; Pl. Resp. ¶¶ 22–24; Target Professionals Personal Services Liability Policy Declarations § 6 ("Exclusions").) I will refer to paragraph (f) as the "Business Enterprise Exclusion" and paragraphs (h) and (p) as the "Insurance Exclusion".[3]

The dispute here is whether RLI is required to fund Princeton's costs of defense of the Underlying 3P Action. Princeton argues that this litigation fell squarely within the policy and not within any of its exclusions. RLI says that the allegations against Princeton do not even involve "Wrongful Acts," as defined in the policy, because they are not connected to the provision of

---

[3] Such exclusions, in the briefing and in the case law, are referred to by a variety of names. *See, e.g.*, *VierraMoore, Inc. v. Continental Cas. Co.*, 607 F. App'x 749 (9th Cir. 2015) ("bond exclusion").

"Management Consulting Services." But even if these acts fall within the general coverage language, says RLI, the claims against Princeton fall within the Insurance Exclusion and the Business Enterprise Exclusion.

## II.     Discussion

### a. Standard of Review

RLI has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is often indistinguishable from a motion to dismiss, except that it is made after the filing of a responsive pleading. Fed. R. Civ. P. 12(h)(2) "provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 426, 428 (3d Cir. 1991)). Accordingly, when a Rule 12(c) motion asserts that the complaint fails to state a claim, the familiar Rule 12(b)(6) standard applies, *id.* (making due allowance, of course, for any factual allegations that are admitted in the responsive pleading). Thus, the moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

I must thus take allegations of the complaint as true and draw reasonable inferences in the light most favorable to the nonmoving party. *Philips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). I am also allowed to consider "extraneous documents that are referred to in the complaint or documents on which the claims in the complaint are based" without converting this motion into one for summary judgment. *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 830 (D.N.J. 2013) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1996 (3d Cir. 1993)).

Princeton has moved for summary judgment. Fed. R. Civ. P. 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met the threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine issues of material fact exist). In deciding a motion for summary judgment, the court's role is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

When the parties file cross-motions for summary judgment (or as in this case, cross-motions for judgment on the pleadings and for summary judgment), the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City*

*of Phila.*, 862 F.2d 214, 216 (3d Cir. 1987)). The court must consider each motion on an individual and separate basis, and determine for each side whether a judgment may be entered in accordance with the motion's standard. *See id.* (citing 10A Charles Alan Wright et al., *Federal Practices & Procedure* § 2720 (3d ed. 2016)); *see also* 5C Wright et al., *Federal Practices & Procedure* § 1369.

In this context, the distinction between a motion for judgment on the pleadings and a motion for summary judgment matters little. The critical documents cited in the summary judgment motion are those on which the complaint is based, and they would properly be considered on a motion to dismiss. The parties both rely on these documents and do not dispute that they are appropriate for consideration.

### b. Interpretation of an Insurance Contract and its Exclusions

New Jersey has well-settled principles of insurance contract interpretation:

> "The principles of insurance contract interpretation are well settled: (1) the interpretation of an insurance contract is a question of law, (2) when interpreting an insurance contract, the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms, (3) when the terms of the contract are clear and ambiguous, the court must enforce the contract as it is written, and the court cannot make a better contract for the parties than the one that they themselves agreed to, (4) where an ambiguity exists, it must be resolved against the insurer, (5) if the controlling language of the policy will support two meanings, one favorable to the insurer and one favorable to the insured, the interpretation supporting coverage will be applied, but (6) an insurance policy is not ambiguous merely because two conflicting interpretations have been offered by the litigants, and a genuine ambiguity exists when the 'phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage."

*State Nat. Ins. Co. v. Cty. of Camden*, 10 F. Supp. 3d 568, 574–75 (D.N.J. 2014) (citing *Simonetti v. Selective Ins. Co.*, 372 N.J. Super. 421 (N.J. Super. Ct. App. Div. 2004)).

A court must not torture the language of a policy to create an ambiguity where none exists in order to impose liability; the words must be construed "so as to adhere to their ordinary meaning." *Resolution Trust Corp. v. Fidelity & Deposit Co. of Md.*, 205 F.3d 615, 643 (3d Cir. 2000) (citing *Longobardi v. Chubb Ins. Co.*, 121 N.J. 530 (1990)). The governing principle requires that courts not write for the insured a better policy of insurance than the one purchased from the insurer. *Id.* Exclusions within insurance policies are presumptively valid if "specific, plain, clear, prominent, and not contrary to public policy," but must be must be narrowly construed. *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 95 (1997) (quoting *Doto v. Russo*, 140 N.J. 544, 559 (1995)). The insurer bears the burden of showing that the facts of the case fall within the exclusion. *Id.*

The insurer has a duty to defend when the complaint states a claim that constitutes a risk. *Sahil v. Woodbine Bd. of Educ.*, 193 N.J. 309, 322 (2008) (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 173 (1992)). This duty to defend is determined by the language of the policy between the insured and insurer; when the complaint and the policy correspond, the insurer must defend the suit. *Id.* Additionally, if multiple alternative causes of action are alleged in the complaint, the insurer's duty to defend continues until every covered claim is eliminated. *Id.* (quoting *Vorhees*, 128 N.J. at 174). "As a practical matter, the determination of an insurer's duty to defend requires review of the complaint with liberality to ascertain whether the insurer will be obligated to indemnify the insured if the allegations are sustained." *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 79 (2011) (citing *Danek v. Hommer*, 28 N.J. Super. 68, 77 (App. Div. 1953)). The complaint should be laid alongside the policy, and the court should look to whether the insurer will be required to pay the judgment, with doubts resolved in favor of the insured. *Id.* In other words, "if the complaint comprehends an injury which *may* be within the policy, a duty to defend will be found." *Id.* (quotation marks omitted). The duty to defend will still be triggered, even if the claim is "groundless, false[,] or

9

fraudulent." *Danek*, 28. N.J. Super. at 77; *Abouzaid*, 207 N.J. at 80 ("'[P]otentially coverable' claims require a defense.").

### c. Wrongful Act

RLI contends initially that the Underlying 3P Complaint does not even allege a covered risk, *i.e.*, a "Wrongful Act" that would be covered by the policy. (Def. Br. 17.) That complaint, says RLI, does not implicate "acts or omission[s] in the furnishing of professional services" by Princeton, as defined in the "Management Consulting Services" section of the policy. (*Id.*) Thus, for example, the complaint does not allege a failure or omission to provide adequate "analysis of management operation issues," "advice and guidance" regarding "strategic goals" or "operational areas through technology and human resource solutions," or to implement "coaching skills" for management and key personnel. Rather, RLI sees the complaint as "alleg[ing] administrative or clerical negligence related to the failure to update an address and pay insurance premiums." Such a "clerical issue," according to RLI, simply does not fall within the scope of professional liability insurance. (*Id.* at 19.)

This reading does not take into account the general gist of the Underlying 3P Complaint and the Initial Complaint. True, the narrative of the Initial Complaint describes a set of miscommunications and misunderstandings where (1) "Cotswold Lane" was confused with "Cottontail Lane," (2) the insurance company changed addresses, and (3) notices of late payment were sent to the wrong address. (IC ¶¶ 4, 35, 37), Nevertheless, the Underlying 3P Complaint alleges something distinct: that Princeton "negligently performed its duties to advise and assist Old Nassau with its finances, accounts and other conduct of its business" by, among other things, (1) failing to "establish and implement a proper 'financial administration" system for Old Nassau to receive, document, and properly track Old Nassau's bills and payments of its bills, including its insurance policy premiums," (2) "establish and/or implement a records system that properly stored Old Nassau's business–related documents and inventory of its assets," and (3) "properly hire and train Old Nassau's

10

employees to manage its accounts and record-keeping, including documenting, tracking, and ensuring timely payments of its bills and other accounts due, such as the life insurance policy premiums." (UC ¶ 21(c)–(e).) What USI and Cope allege against Princeton is not merely failure to perform clerical functions. They allege a professional failure: inadequate consulting and guidance, particularly in the area of helping Old Nassau create a system to keep track of its insurance bills and pay them on time. Coverage of such errors is clearly contemplated in part (iii) of the provision that defines "Management Consulting Services" as "advice and guidance on improving the efficiency of functional or operational areas through technology and human resource solutions." (Pl. St. ¶¶ 5, 7; Def. Resp. ¶¶ 5–7; Target Professionals Personal Services Liability Policy Declarations § 1 ("Management Consulting Services Endorsement").)

Recognizing that insurance contracts, when unclear, must be read liberally in favor of coverage, see *State Nat. Ins. Co.*, 10 F. Supp. 3d at 574–75, I find that the Underlying 3P Complaint's allegations place the case within the scope of coverage. The Underlying 3P Complaint alleges a Wrongful Act that falls within the scope of coverage of RLI's professional liability policy.

### d. RLI Policy Insurance Exclusion

I next consider the RLI Policy's explicit exclusion of risks that might otherwise be covered. RLI invokes the "Insurance Exclusion" and the "Business Enterprise Exclusion." Because the Insurance Exclusion bars coverage, I do not reach the Business Enterprise Exclusion.

The Insurance Exclusion states that RLI "shall not be liable for damages or claim expenses in connection with any claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving: . . . any actual or alleged failure to effect or maintain any insurance or bond." (Professional Liability Policy, *supra* Section I, § 6.h.) The applicability of the Insurance Exclusion turns on two interconnected issues.

First, it turns on the construction of the Insurance Exclusion's language: "arising out of, directly or indirectly resulting from or in consequence of and in

11

any way involving" and "failure to maintain any insurance." (*Id.* (emphasis added).) Second, it turns on the characterization of the underlying suit against Princeton. That underlying suit can be characterized narrowly as one about the failure to ensure that bills were paid, or more broadly as one about the failure to keep a life insurance policy from lapsing.

*Management Specialists, Inc. v. Northfields Insurance Company*, 117 P.3d 32 (Colo. App. 2004), interpreted an insurance exclusion in a professional liability policy like the one here. MSI, a property manager, was supposed to maintain insurance on behalf of its client homeowners' associations. The client sued MSI, claiming that MSI made late premium payments, causing the client's insurance to lapse, and then lied about it. 117 P.3d at 35. The appellate court affirmed summary judgment denying defense and indemnification, finding that an insurance exclusion applied. *Id.* at 35–37. That exclusion was phrased similarly to the Insurance Exclusion here: "[T]he policy contained an exclusion stating that the policy did not apply to '[a]ny damages arising out of the failure or inability to maintain adequate levels or types of insurance.'" *Id.*

The *Management Specialists* court found the insurance exclusion to be unambiguous as applied to the case at hand:

> [V]iewing the exclusion in the context of the entire policy, we perceive no ambiguity. The policy provides coverage for [the company]'s negligent acts, errors, or omissions in its performance of professional services, but excludes coverage for damages arising out of its failure or inability to maintain adequate levels or types of insurance as part of those services. The exclusion means simply that [the company]'s failure to maintain insurance of *any* kind, whether for itself or for others, is excluded from coverage. The exclusion does not differentiate between types of insurance or for whom the insurance is maintained.

*Id.* at 36. The court noted that the lapse of insurance was the impetus for the underlying lawsuit and that all the claims in that suit "arose out of the failure to maintain insurance coverage." They therefore fell within the insurance exclusion. *Id.* at 37.[4]

---

[4] Princeton correctly points out that cases cited by RLI, like *Management Specialists*, apply non-New Jersey law. (Pl. Opp./Br. 28.) However, Colorado's contract

The exclusion in RLI's policy with Princeton is similar to the one quoted in *Management Specialists*. It adds no constraining or limiting language, and it is similarly unambiguous. *See also VierraMoore, Inc. v. Continental Cas. Co.*, 607 F. App'x 749, 749 (9th Cir. 2015) ("[T]he bond exclusion, which excluded coverage of any claim 'based upon, directly or indirectly arising out of, or in any way involving the failure to effect or maintain any insurance or bond,' is broad, unambiguous, and enforceable."). As in *Management Specialists*, there is nothing in the exclusion suggesting that it applies only to, *e.g.,* Princeton's failure to maintain insurance for itself. To the contrary, the language comfortably accommodates the situation in which Princeton failed in its duty to ensure that one of its clients had insurance. More importantly, as held in *Management Specialists*, the exclusion language is broad enough to encompass the failure of a paid manager, Princeton, to ensure timely payments, resulting in the lapse of the client, Old Nassau's key person policy.

So the Insurance Exclusion appears on its face to apply. Still, the duty to defend is broader than the duty to indemnify. I must take special care to determine whether Princeton was defending against any claim which, even if meritless, fell within the scope of the policy's coverage. The claims against Princeton in the Underlying 3P Complaint must not be read so narrowly that "[the] insurance company [may] construct a formal fortress of the third-party's

---

interpretation methodology as applied to insurance exclusions is substantively similar to New Jersey's. *Compare Mgmt. Specialists*, 117 P.3d at 35–36 *with State Nat. Ins. Co.*, 10 F. Supp. 3d at 574–75. In the absence of controlling New Jersey precedent, *Management Specialists* is persuasive.

The Court in *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Ass'n, Inc.*, 288 Ga. App. 355, 363–64 (Ga. App. 2007), distinguished its case from *Mgmt. Specialists*. There, the exclusion applied to "failure to effect . . . insurance." *Fireman's* also relied to some degree on the policy's being a nonprofit organization liability policy, a factor not present here, and the unique circumstances at issue in the case. *Fireman's*, 288 Ga. 355, 361 n.4, 362 ("Bearing these definitions in mind, one could reasonably construe the exclusion at issue [as the Court did in *Mgmt. Specialists*] as excluding coverage where the claim is based on the defendant's failure to procure, obtain, or continue insurance, regardless of the type of insurance, the circumstances giving rise to the defendant's duty to procure, obtain, or continue insurance, or the type of damages the plaintiff claims to have sustained by the defendant's failure").

13

pleadings and . . . retreat behind its walls." *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 199 (1992). "Insureds expect their coverage and defense benefits to be determined by the nature of the claim against them, not the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured." *Id.* at 198–99.

In the Underlying 3P Complaint, USI and Cope allege a litany of wrongful or negligent acts by Princeton (*e.g.*, failing to ensure the insurance policy was up to date; failing to notify the appropriate parties of the mail address change; failing to notify Old Nassau that premiums were due; failing to establish a record keeping system that would keep track of Old Nassau's bills). (UC ¶¶ 20–21.) The Underlying 3P Complaint is suffused with the issue of the loss of insurance coverage. That is the whole gist of the claimed damages.

The Underlying 3P Complaint is also intimately tied to the Initial Complaint. The Underlying 3P Complaint alleges that "Old Nassau's alleged loss in its [Initial Complaint] was directly and proximately caused by the aforesaid negligence, conduct, acts and/or omissions by [Princeton]," which thus should be held liable for the loss to Old Nassau. (UC ¶¶ 22–23.) The Underlying 3P Complaint is thus dependent on the Initial Complaint, to which I must also look in determining the scope of the claims by USI and Cope against Princeton.

In its Initial Complaint, Old Nassau asserted four counts against its insurance provider and insurance broker: professional negligence and breach of duty, negligent misrepresentation, breach of special relationship, and breach of contract against principal/reformation. (IC ¶¶ 66–116.) The relief Old Nassau sought was "reformation of the [life insurance] policy," "a determination that the cancellation of the policy be deemed null and void," "the award of damages in the amount of at least $15,000,000.00" plus lost value and profits to Old Nassau, and attorneys' fees and costs. (*Id.*)

The Initial Complaint was solely about the loss of the benefit of coverage under several life insurance policies. Without the lapse of the policy, there

14

would not have been a complaint. *See VierraMoore, Inc.*, 840 F. Supp. 2d at 1282 (explaining that had insured ensured that the surety bonds were enforceable, plaintiff would otherwise have no cause of action in the underlying action and all the other claims stemming from that complaint would not be coverable). No other damages are asserted except for those that flow from the lapse of the policy. *See Management Specialists*, 117 P.3d at 37 (denying coverage fraud and misrepresentation claims dependent on lapse of insurance claims, which had been denied). Without the coverage loss alleged in the Initial Complaint, the Underlying 3P Complaint has no meaning or substance. The Initial Complaint, on which the Underlying 3P Complaint is dependent, confirms that this case is all about failure to maintain coverage.[5]

The Underlying 3P Complaint, whether viewed alone or in the context of the Initial Complaint, involves "actual or alleged failure to effect or maintain any insurance or bond" within the meaning of the Insurance Exclusion.

One issue remains. Conceding *arguendo* that the claim against it has some relation to insurance, Princeton nevertheless argues that it only incidentally involves maintenance of insurance coverage. Princeton says it was tasked with setting up accounting software, and that any failure to track Old Nassau's payment of insurance bills gives rise to a run-of-the-mill malpractice case, not an insurance litigation. Such an incidental connection to insurance, says Princeton, is insufficient to invoke the Insurance Exclusion.

Even under such a reading, this remains a case about the failure to "maintain insurance," for the reasons stated above. At any rate, I do not accept the premise of Princeton's argument, *i.e.*, that the insurance connection is fortuitous or incidental. Princeton did not, for example, provide Old Nassau

---

[5] RLI states that "the reason [its] Policy excludes insurance procurement-related claims is simple. Without such an exclusion, [its] Policy could conceivably be forced to step in and replace any other insurance policy that was not procured or maintained, for whatever reason, due to Princeton's acts or omissions." (Def. Reply 3.) The provider may find itself in a double bind: liable because its insured suffered a risk for which it obtained coverage, and liable because its insured suffered a risk for which it did not obtain coverage. *See id.* ("[I]n this case the RLI Policy would be transformed into three key man life insurance policies. RLI never agreed to take on that risk.").

15

with the services of a bookkeeper (or the software equivalent) who committed an oversight that just happened to involve an insurance bill. As described in both the Underlying 3P Complaint and the Initial Complaint, Princeton had a much more specific managerial role in Old Nassau's procurement and maintenance of its life insurance policies.[6] And of course it is the nature of those allegations that controls the issue of the insurer's duty to fund defense costs.

Princeton's liability in the Underlying 3P Complaint hinges on its role as an insurance administrator, apart from its function in setting up Old Nassau's bill-paying functions. Princeton's situation is similar to that in *Management Specialists* in every way that matters. The Underlying 3P Complaint thus falls within the insurance exclusion; Princeton was not entitled to a defense under the RLI Policy.

---

[6] *See, e.g.*, UC ¶ 9 ("Pursuant to [the Agreement between Princeton and Old Nassau], [Princeton] agreed to provide the following services to Old Nassau . . . ***advise*** and *assist* [Old Nassau] in the conduct of its business, including without limitation . . . ***insurance services*** . . . ."); ¶ 12 ("Sivitz and Arthurs, on behalf of [Princeton] and pursuant to the Agreement, assisted Old Nassau in the conduct of its business, including operational growth, cash flow management, strategic planning, financial services, and insurance services."); ¶ 13 ("Specifically, Sivitz was the [Princeton] "insurance guy" for Old Nassau. Pursuant to the Agreement, Sivitz/[Princeton] were responsible for obtaining and maintaining all of Old Nassau's insurance coverages, including general liability, property, worker's compensation, D&O liability, fiduciary liability, and the key man life insurance coverages on Malcolm Lloyd's life at issue in this litigation. . . . Furthermore, Sivitz/[Princeton] reviewed and approved of offers of insurance and gave authority on behalf of Old Nassau to bind its coverages. He negotiated lower premiums on behalf of Old Nassau, he was responsible for ensuring timely payments were made with regard to Old Nassau's insurance premiums, and he was responsible for maintaining Old Nassau's insurance documents. . . . In short, Sivitz/[Princeton] headed the day-to-day insurance needs of Old Nassau.").)

### III.  Conclusion

The Insurance Exclusion encompasses Princeton's defense against USI and Cope's claims against it in the Underlying 3P Complaint. I therefore find that Princeton was not entitled under the RLI Policy to reimbursement of its defense costs. I will therefore grant RLI's motion for judgment on the pleadings and deny Princeton's cross-motion for summary judgment. An appropriate order follows.

Dated: February 9, 2018

_____
**Kevin McNulty**
**United States District Judge**